Frank **CHIPREAN**, Appellant–Defendant,

v.

**BRODY & LACY STOCK,**
Appellees–Plaintiffs.

No. 48A04–0907–CV–389.

Court of Appeals of Indiana.

April 26, 2010.

---

Mark R. Regnier, Bingham Farrer & Wilson, PC, Elwood, IN, Attorney for Appellant.

John M. Blevins, Anderson, IN, Attorney for Appellees.

## OPINION

BARNES, Judge.

### Case Summary

Frank Chiprean appeals the trial court's judgment against him in the amount of $6000 in favor of Brody and Lacy Stock. We affirm.

### Issue

The restated issue before us is whether the trial court properly treated the Stocks' action against Chiprean as an eviction and not as an equitable foreclosure.

### Facts

On February 7, 2007, Chiprean executed a "Purchase Agreement" for a house in Anderson owned by the Stocks. App. p. 9. The agreed purchase price was $103,995, and the completion of the sale was contingent upon Chiprean obtaining a mortgage to purchase the house. Because Chiprean was not able to obtain the necessary financing at that time but wanted to obtain immediate possession of the property, he and the Stocks had executed a "Pre–Closing Possession Agreement" ("possession agreement") on February 6, 2007. *Id.* at 14. The possession agreement permitted Chiprean to take possession of the house in March 2007, provided he made monthly payments of $895 to the Stocks; this amount later was increased in March 2008 with Chiprean's consent to $962 per month.

Final closing for purchase of the house was to occur no later than eighteen months after Chiprean obtained possession, with the possibility of a six-month extension for closing if Chiprean had been making timely payments under the possession agreement. The possession agreement stated that "Buyer agrees to accept Property at time of possession in its current condition with no further responsibility by Seller for its maintenance or repair." *Id.* at 14. It also required Chiprean to deposit $5000 with the listing broker. If Chiprean did not close the transaction, that amount was to be "forfeited by Buyer & Seller." *Id.*

Chiprean did not make an independent inspection of the house before taking pos-

session of it. At some point during Chi-prean's possession of the house, the roof over the great room entirely collapsed. The Stocks arranged through their insurance company to have the roof repaired while Chiprean continued living there, albeit confined primarily to the master bedroom and without heat or air conditioning.[1] Chiprean was dissatisfied with the contractor's progress on the repairs. He made regular payments under the possession agreement until December 2007, apparently after the roof had collapsed, when he began making either no payments or only partial payments. The Stocks' insurance company reimbursed them for four missed rental payments in 2008. In January 2009, an appraiser hired by Chiprean valued the house at $81,900.

On January 15, 2009, the Stocks filed a small claims action to have Chiprean evicted from the house. The chronological case summary reveals that on February 17, 2009, Chiprean consented to an "Immediate Order of Eviction." *Id.* at 2. The trial court then set a separate hearing on damages for March 25, 2009. Chiprean filed a counterclaim against the Stocks, seeking recovery of the $5000 deposit. On March 27, 2009, the trial court entered a $6000 judgment in favor of the Stocks.[2] As for the counterclaim, there was testimony presented at the damages hearing that the $5000 deposit was split between the Stocks' and Chiprean's real estate brokers. After denial of a motion to correct error, Chiprean now appeals.

### Analysis

■ We review judgments in small claims actions " 'as prescribed by relevant

Indiana rules and statutes.' " *Trinity Homes, LLC v. Fang,* 848 N.E.2d 1065, 1067 (Ind.2006) (quoting Ind. Small Claims Rule 11(A)). A clearly erroneous standard of review applies to facts determined in a bench trial, with due regard given to the opportunity of the trial court to assess witness credibility. *Id.* This deferential standard is especially important in small claims actions, because trials are " 'informal, with the sole objective of dispensing speedy justice between the parties according to the rules of substantive law.' " *Id.* at 1067–68 (quoting *City of Dunkirk Water & Sewage Dep't v. Hall,* 657 N.E.2d 115, 116 (Ind.1995) (in turn quoting S.C.R. 8(A))). This deferential standard does not apply, however, to substantive rules of law, which are reviewed de novo just as they are in appeals from any other court. *Id.* at 1068. Also, if a small claims case turns solely on documentary evidence, we review the case de novo, just as with summary judgment rulings and other "paper records." *Id.*

■ Chiprean contends that rather than simply evicting him from the house and awarding missed "rental" payments to the Stocks, the trial court should have foreclosed his interest in the property pursuant to *Skendzel v. Marshall,* 261 Ind. 226, 301 N.E.2d 641 (1973). Chiprean argues that the trial court's action resulted in a forfeiture of his interest in the property. In a foreclosure proceeding, the property is sold, with the proceeds of the sale being first applied to the balance of the contract principal and interest owed to the seller. *Myers v. Leedy,* 915 N.E.2d 133, 137 n. 3 (Ind.2009). Then, junior lienholders take their share, and finally any remaining surplus goes to the buyer. *Id.*

---

**1.** Chiprean testified at trial that he did not move out because there was no other place he could live.

**2.** The Stocks actually listed damages in the amount of $10,513 based on missed pay-

ments, attorney fees, and Chiprean's alleged conversion of a washer and dryer. They agreed to accept a judgment of only $6000 in order to stay within small claims court jurisdictional limits.

By contrast, a forfeiture is a " 'divestiture of property without compensation.' " *Id.* (quoting Black's Law Dictionary 677 (8th ed. 2004)).

■ We note that Chiprean has waived any argument that the trial court ought to have conducted a foreclosure sale of the property. Although the actual order is not in the record before us, the chronological case summary does indicate that on February 17, 2009, Chiprean consented to being "evicted" from the property, with damages to be determined at a later date. At no point during that later hearing did Chiprean request that the property be foreclosed. "A party generally waives appellate review of an issue or argument unless the party raised that issue or argument before the trial court." *GKC Indiana Theatres, Inc. v. Elk Retail Investors, LLC,* 764 N.E.2d 647, 652 (Ind.Ct.App. 2002).

■ Waiver notwithstanding, Chiprean was not entitled to demand that the Stocks' property be subjected to a foreclosure proceeding. Our supreme court recently discussed *Skendzel* as follows:

> In *Skendzel* the vendor sought a judicial declaration of forfeiture against a tardy purchaser who had already paid $21,000.00 out of a $36,000.00 contract price. The Court noted that under a typical conditional land sale contract, the vendor retains legal title until the total contract price is paid by the vendee, but equitable title vests in the vendee at the time the contract is consummated. And, once consummated, a land sale contract constitutes a present sale and purchase of the property, with the vendor retaining the legal title of the property as security for the performance of the con-

tract. However, in ordering that the contract at issue be foreclosed in accordance with Indiana Trial Rule 69(C) and the mortgage foreclosure statute, Indiana Code § 32–8–16–1 (now Indiana Code § 32–29–9–1), this Court declared, "[C]onceptually ... the retention of the title by the vendor is the same as reserving a lien or mortgage. Realistically, vendor-vendee should be viewed as mortgagee-mortgagor. To conceive of the relationship in different terms is to pay homage to form over substance."

*Myers,* 915 N.E.2d at 137 (citations omitted).

■ Of course, in order to enjoy the benefit of *Skendzel's* holding, there must actually be a "consummated" land sale contract with respect to a piece of land. We cannot say that such a contract existed here. The meaning of the contracts the parties entered into is a pure question of law and is reviewed de novo. *Trinity Homes, LLC,* 848 N.E.2d at 1068. Here, completion of the purchase agreement the parties executed was expressly contingent upon Chiprean being able to obtain suitable financing. Chiprean never obtained the financing. A contract to purchase real estate that is made contingent upon the buyer's ability to obtain financing is not enforceable until such financing is obtained. *Airport Inn Enters., Inc. v. Ramage,* 679 N.W.2d 269, 272 (N.D.2004); *see also Dvorak v. Christ,* 692 N.E.2d 920, 924 (Ind.Ct.App.1998), *trans. denied* (holding that real estate purchase agreement terminated of its own accord when prospective buyer failed to obtain financing by date specified in agreement).[3] We cannot conclude that the purchase agreement consti-

---

**3.** If, however, a vendor evidences an intention not to perform a purchase agreement containing a financing contingency, the buyer need not tender the purchase price in order to sue for specific performance of the agreement. *See Alexander v. Dowell,* 669 N.E.2d 436, 440 (Ind.Ct.App.1996).

tuted a "consummated" land sale contract, because the contingency required to make it fully effective never occurred.

As for the possession agreement, it appears to be more in the nature of a lease than a land sale contract, though we do not believe it necessary to expressly label this agreement a lease. Our research has failed to uncover any Indiana cases analyzing the nature and effect of a pre-closing possession agreement such as the one here. We reviewed one case from New York wherein the court held that payments made under a pre-closing possession agreement did not create an equitable interest in the property because there was a lack of "clear intent between the parties that such property be held, given or transferred as security for an obligation...." *Kaya v. B & G Holding Co., LLC,* 48 A.D.3d 521, 853 N.Y.S.2d 95, 96 (N.Y.App. Div.2008). We conclude that there likewise is a lack of such clear intent in this case.

"The relationship between a vendor and a vendee in possession under a contract to purchase land is generally not that of landlord and tenant, but it is analogous thereto.... In many respects, the relationship is governed by principles applicable to the relation of landlord and tenant...." 77 Am. Jur. 2d *Vendor and Purchaser* § 270 (2006). Here, the possession agreement expressly states that it was to terminate if any of the conditions precedent to closing as provided for in the purchase agreement were not fulfilled. Thus, the term of possession was limited, not permanent, and expressly tied to the purchase agreement. As noted, the contingency required to make the purchase agreement effective never occurred.

The possession agreement also expressly stated that the monthly payments Chiprean was to make to the Stocks were "consideration for possession of Proper-

ty...." App. p. 14. There is nothing in either the purchase agreement or possession agreement indicating that the monthly payments were intended to pay down any contract balance owed to the Stocks for purchase of the home. Indeed, no such contract balanced existed. This payment arrangement is unlike ones that commonly are seen in land sale contracts, where the full contract price is stated and monthly payments are calculated for an extended period of time until the contract balance is paid in full. *See, e.g., Skendzel,* 261 Ind. at 228–29, 301 N.E.2d at 643 (land sale contract stated principal sum, payment schedule, and expressly stated that no interest was being charged); *Armstrong v. Keene,* 861 N.E.2d 1198, 1199 (Ind.Ct.App.2007), (land sale contract stated purchased price, required down payment amount, monthly payment amount, and interest rate), *trans. denied; McLemore v. McLemore,* 827 N.E.2d 1135, 1138 (Ind.Ct.App.2005) (land sale contract stated principal sum, required down payment amount, monthly payment amount, and interest rate).

Reading the purchase and possession agreements, we cannot conclude that they, either together or separately, constitute a land sale contract or reflect an intent by the parties that Chiprean have an equitable interest in the property. As such, Chiprean was not entitled to the benefit of foreclosure proceedings, and the trial court properly viewed the monthly payments he was to make to the Stocks under the possession agreement as akin to rent.

■ As for the $5000 payment required of Chiprean by the possession agreement, that agreement does not indicate that it was to be considered a "down payment" in the sense of reducing the amount of the purchase price that Chiprean would have to pay. Rather, the agreement clearly states that the $5000 constituted "Brokerage fees nonrefundable to buyer & seller."

App. p. 14. The evidence demonstrates that the $5000 was in fact distributed to Chiprean's and the Stocks' brokers after Chiprean was evicted from the premises. To the extent Chiprean is arguing that this nonrefundable $5000 deposit constituted inappropriate liquidated damages, he has not sued the appropriate parties to make such an argument. His counterclaim to recover the $5000 was against the Stocks, not the brokers, and the Stocks did not receive any of the $5000.

■ Regarding Chiprean essentially arguing that it was unfair to expect him to continue making the monthly payments while the house was in disrepair and, he claims, nearly unlivable, we make the following observations. First, the possession agreement clearly stated that the Stocks as sellers were to have "no further responsibility ... for [the property's] maintenance or repair." *Id.* Thus, the Stocks were under no obligation to attempt any repair of the property and did so gratuitously. Chiprean also makes no cogent argument that the Stocks engaged in fraud in filling out the real estate disclosure form with respect to the condition of the roof, and he did not undertake an independent inspection of the property himself before signing the purchase and possession agreements.[4]

Furthermore, to the extent the possession agreement resembled a lease of the property, it is possible for a tenant to claim constructive eviction where a landlord's act or omission deprives the tenant of the beneficial enjoyment of some part of the premises. *Village Commons, LLC v. Marion County Prosecutor's Office,* 882 N.E.2d 210, 216 (Ind.Ct.App.2008), *trans.*

*denied* (quoting *Talbott v. English,* 156 Ind. 299, 307–08, 59 N.E. 857, 860 (1901)). Constructive eviction permits the tenant to avoid liability for rent, but *only* if the tenant quits the property. *Id.* Chiprean did not quit the property. As such, we conclude Chiprean is not permitted to avoid liability for payments under the possession agreement, despite his contention that the house was largely unlivable after the roof collapsed.

### Conclusion

Chiprean has waived his argument that the trial court was required to dispose of his interest in the Stocks' property through foreclosure proceedings. Waiver notwithstanding, Chiprean did not have an equitable interest in the property, and the trial court did not err in evicting him from the property and holding him liable for payments he failed to make to the Stocks under the possession agreement. It also did not err in denying Chiprean's counterclaim. We affirm.

Affirmed.

BAILEY, J., and MAY, J., concur.

---

4. Chiprean summarily asserts in his brief that the Stocks had "unclean hands" because they attempted to sell him a house with major defects. Appellant's Br. p. 13. We do not believe this is sufficient to constitute a cogent argument alleging knowing or intentional fraud with respect to the real estate disclosure form, as outlined in cases such as *Reum v. Mercer,* 817 N.E.2d 1267, 1272 (Ind.Ct.App. 2004).